# First Amendment to the United States Constitution

From Wikipedia, the free encyclopedia

**United States of America**

This article is part of the series:

**United States Constitution**

**Original text of the Constitution**

**Preamble**
**Articles of the Constitution**

I · II · III · IV · V · VI · VII

**Amendments to the Constitution**

**Bill of Rights**

**I** · II · III · IV · V · VI · VII · VIII · IX · X

**Subsequent Amendments**

XI · XII · XIII · XIV · XV · XVI · XVII · XVIII · XIX · XX · XXI · XXII · XXIII · XXIV · XXV · XXVI · XXVII

**Unratified Amendments**

I(1) · XIII(1) · XIII(2) · XX(1) · XXVII(1) · XXVII(2)

**Full text of the Constitution**

Original Constitution
Bill of Rights
Subsequent Amendments
Unsuccessful Amendments

Other countries · **Law Portal**

view · talk · edit (//en.wikipedia.org/w/index.php?title=Template:US_Constitution_article_series&action=edit)

The **First Amendment (Amendment I)** to the United States Constitution prohibits the making of any law respecting an establishment of religion, impeding the free exercise of religion, abridging the freedom of speech,

Case 3:13-cv-01238-CAB-BLM Document 5-8 Filed 09/10/13 Page 2 of 28

infringing on the freedom of the press, interfering with the right to peaceably assemble or prohibiting the petitioning for a governmental redress of grievances. It was adopted on December 15, 1791, as one of the ten amendments that comprise the Bill of Rights.

The Bill of Rights was originally proposed as a measure to assuage Anti-Federalist opposition to Constitutional ratification. Initially, the First Amendment applied only to laws enacted by the Congress, and many of its provisions were interpreted more narrowly than they are today. Beginning with *Gitlow v. New York* (1925), the Supreme Court applied the First Amendment to states—a process known as incorporation—through the Due Process Clause of the Fourteenth Amendment.

In *Everson v. Board of Education* (1947), the Court drew on Founding Father Thomas Jefferson's correspondence to call for "a wall of separation between church and State", though the precise boundary of this separation remains in dispute. Speech rights were expanded significantly in a series of 20th and 21st-century court decisions which protected various forms of political speech, anonymous speech, campaign financing, pornography, and school speech; these rulings also defined a series of exceptions to First Amendment protections. The Supreme Court overturned English common law precedent to increase the burden of proof for defamation and libel suits, most notably in *New York Times Co. v. Sullivan* (1964). Commercial speech, however, is less protected by the First Amendment than political speech, and is therefore subject to greater regulation.

The Free Press Clause protects publication of information and opinions, and applies to a wide variety of media. In *Near v. Minnesota* (1931) and *New York Times v. United States* (1971), the Supreme Court ruled that the First Amendment protected against prior restraint—pre-publication censorship—in almost all cases. The Petition Clause protects the right to petition all branches and agencies of government for action. In addition to the right of assembly guaranteed by this clause, the Court has also ruled that the Amendment implicitly protects freedom of association.

## Contents

- 1 Text
- 2 Background
- 3 Establishment of religion
    - 3.1 Separationists
    - 3.2 Accommodationists
- 4 Free exercise of religion
- 5 Freedom of speech
    - 5.1 Speech critical of the government
        - 5.1.1 World War I
        - 5.1.2 Extending protections
    - 5.2 Political speech
        - 5.2.1 Anonymous speech
        - 5.2.2 Campaign finance
        - 5.2.3 Flag desecration
        - 5.2.4 Falsifying military awards
    - 5.3 Commercial speech
    - 5.4 School speech

Case 3:13-cv-01238-CAB-BLM Document 5-8 Filed 09/10/13 Page 3 of 28

- 5.5 Obscenity
- 5.6 Memoirs of convicted criminals
- 5.7 Defamation
- 5.8 Private action
- 6 Freedom of the press
- 7 Petition and assembly
- 8 Freedom of association
- 9 See also
- 10 References
- 11 Further reading
- 12 External links

# Text

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.[1]

The Bill of Rights in the National Archives

# Background

*Main article: Anti-Federalism*

In 1776, the second year of the American Revolutionary War, the Virginia colonial legislature passed a Declaration of Rights that included the sentence "The freedom of the press is one of the greatest bulwarks of liberty, and can never be restrained but by despotic Governments." Eight of the other thirteen states made similar pledges. However, these declarations were generally considered "mere admonitions to state legislatures", rather than enforceable provisions.[2]

James Madison, drafter of the Bill of Rights

After several years of comparatively weak government under the Articles of Confederation, a Constitutional Convention in Philadelphia proposed a new constitution on September 17, 1787, featuring among other changes a stronger chief executive. George Mason, a Constitutional Convention delegate and the drafter of Virginia's Declaration of Rights, proposed that the Constitution include a bill of rights listing and guaranteeing civil liberties. Other delegates —including future Bill of Rights drafter James Madison—disagreed, arguing that existing state guarantees of civil liberties were sufficient and that any attempt to enumerate individual rights risked the implication that other, unnamed rights were unprotected. After a brief debate, Mason's proposal was defeated by a unanimous vote of the state delegations.[3]

For the constitution to be ratified, however, nine of the thirteen states were required to approve it in state conventions. Opposition to ratification ("Anti-Federalism") was partly based on the Constitution's lack of adequate

guarantees for civil liberties. Supporters of the Constitution in states where popular sentiment was against ratification (including Virginia, Massachusetts, and New York) successfully proposed that their state conventions both ratify the Constitution and call for the addition of a bill of rights. The U.S. Constitution was eventually ratified by all thirteen states. In the 1st United States Congress, following the state legislatures' request, James Madison proposed twenty constitutional amendments, which were then condensed to twelve and forwarded to the states. Ten of these were ratified and became the Bill of Rights.[4] The First Amendment passed the House and Senate with almost no recorded debate, complicating future discussion of the Amendment's intent.[5][6] The First Amendment (along with the rest of the Bill of Rights) was submitted to the states for ratification on September 25, 1789, and adopted on December 15, 1791.[7][8]

# Establishment of religion

*Main article: Establishment Clause*

Originally, the First Amendment applied only to the federal government, and some states continued official state religions after ratification. Massachusetts, for example, was officially Congregationalist until the 1830s.[9]

In 1947, the U.S. Supreme Court decision *Everson v. Board of Education* incorporated the Establishment Clause (i.e., made it apply against the states). In the majority decision, Justice Hugo Black wrote,

> The "establishment of religion" clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion to another ... in the words of Jefferson, the [First Amendment] clause against establishment of religion by law was intended to erect 'a wall of separation between church and State' ... That wall must be kept high and impregnable. We could not approve the slightest breach."[10]

In *Torcaso v. Watkins* (1961), the Supreme Court ruled that the Constitution prohibits states and the federal government from requiring any kind of religious test for public office. In the *Board of Education of Kiryas Joel Village School District v. Grumet* (1994),[11] Justice David Souter, writing for the majority, concluded that "government should not prefer one religion to another, or religion to irreligion."[12] In a series of cases in the first decade of the 2000s—*Van Orden v. Perry* (2005), *McCreary County v. ACLU* (2005), and *Salazar v. Buono* (2010)— the Court considered the issue of religious monuments on federal lands without reaching a majority reasoning on the subject.[13]

## Separationists

*Everson* used the metaphor of a wall of separation between church and state, derived from the correspondence of President Thomas Jefferson. It had been long established in the decisions of the Supreme Court, beginning with *Reynolds v. United States* from 1879, when the Court reviewed the history of the early Republic in deciding the extent of the liberties of Mormons. Chief Justice Morrison Waite, who consulted the historian George Bancroft, also discussed at some length the *Memorial and Remonstrance against Religious Assessments* by James Madison, who drafted the First Amendment; Madison used the metaphor of a "great barrier."[14]

Justice Hugo Black adopted Jefferson's words in the voice of the Court.[15] The Court has affirmed it often,

with majority, but not unanimous, support. Warren Nord, in *Does God Make a Difference?*, characterized the general tendency of the dissents as a weaker reading of the First Amendment; the dissents tend to be "less concerned about the dangers of establishment and less concerned to protect free exercise rights, particularly of religious minorities."[16]

U.S. President Thomas Jefferson wrote in his correspondence of "a wall of separation between church and State".

Beginning with the *Everson* decision itself, which permitted New Jersey school boards to pay for transportation to parochial schools, the Court has used various tests to determine when the wall of separation has been breached. The *Everson* decision laid down the test that establishment existed when aid was given to religion, but that the transportation was justifiable because the benefit to the children was more important. In the school prayer cases of the early 1960s, (*Engel v. Vitale* and *Abington School District v. Schempp*), aid seemed irrelevant; the Court ruled on the basis that a legitimate action both served a secular purpose and did not *primarily* assist religion. In *Walz v. Tax Commission* (1970), the Court ruled that a legitimate action could not entangle government with religion; in *Lemon v. Kurtzman* (1971), these points were combined, declaring that an action was not establishment if:[17]

1. the statute (or practice) has a secular purpose;
2. its principal or primary effect neither advances nor inhibits religion; and
3. it does not foster an excessive government entanglement with religion.

This Lemon test has been criticized by justices and legal scholars, but it remains the predominant means by which the Court enforces the Establishment Clause.[18] In *Agostini v. Felton* (1997), the entanglement prong of the Lemon test was demoted to simply being a factor in determining the effect of the challenged statute or practice.[19] In *Zelman v. Simmons-Harris* (2002), the opinion of the Court considered secular purpose and the absence of primary effect; a concurring opinion saw both cases as having treated entanglement as part of the primary purpose test.[18]

### Accommodationists

Accommodationists, in contrast, argue along with Justice William O. Douglas that "[w]e are a religious people whose institutions presuppose a Supreme Being".[20] This group holds that the Lemon test should be applied selectively.[20] As such, for many conservatives, the Establishment Clause solely prevents the establishment of a state church, not public acknowledgements of God nor "developing policies that encourage general religious beliefs that do not favor a particular sect and are consistent with the secular government's goals."[21][22]

## Free exercise of religion

*Main article: Free Exercise Clause*

"Freedom of religion means freedom to hold an opinion or belief, but not to take action in violation of social

duties or subversive to good order," Chief Justice Waite wrote in Reynolds v. United States (1878). The U.S. Court found that while laws cannot interfere with religious belief and opinions, laws can be made to regulate some religious practices, e.g., human sacrifices, and the Hindu practice of suttee. The Court stated that to rule otherwise, "would be to make the professed doctrines of religious belief superior to the law of the land, and in effect permit every citizen to become a law unto himself. Government would exist only in name under such circumstances."[23] In Cantwell v. State of Connecticut the Court held that the free exercise of religion is one of the "liberties" protected by the due process clause of the 14th Amendment and thus applied it to the states. The freedom to believe is absolute, but the freedom to act is not absolute.[24]

In *Sherbert v. Verner* (1963),[25] the Supreme Court required states to meet the "strict scrutiny" standard when refusing to accommodate religiously motivated conduct. This meant that a government needed to have a "compelling interest" regarding such a refusal. The case involved Adele Sherbert, who was denied unemployment benefits by South Carolina because she refused to work on Saturdays, something forbidden by her Seventh-day Adventist faith.[26] In *Wisconsin v. Yoder* (1972), the Court ruled that a law that "unduly burdens the practice of religion" without a compelling interest, even though it might be "neutral on its face," would be unconstitutional.[27][28]

The need for a compelling interest was narrowed in *Employment Division v. Smith* (1990),[29] which held no such interest was required under the Free Exercise Clause regarding a law that does not target a particular religious practice.[30] In *Church of Lukumi Babalu Aye v. City of Hialeah* (1993),[31] the Supreme Court ruled Hialeah had passed an ordinance banning ritual slaughter, a practice central to the Santería religion, while providing exceptions for some practices such as the kosher slaughter. Since the ordinance was not "generally applicable," the Court ruled that it needed to have a compelling interest, which it failed to have, and so was declared unconstitutional.[32]

In 1993, the Congress passed the Religious Freedom Restoration Act (RFRA), which sought to restore the compelling interest requirement applied in *Sherbert* and *Yoder*. In *City of Boerne v. Flores* (1997),[33] the Court struck down the provisions of the Act that forced state and local governments to provide protections exceeding those required by the First Amendment on the grounds that while the Congress could enforce the Supreme Court's interpretation of a constitutional right, the Congress could not impose its own interpretation on states and localities.[34] According to the court's ruling in *Gonzales v. UDV* (2006),[35] RFRA remains applicable to federal laws and so those laws must still have a "compelling interest".[36]

## Freedom of speech

*Main articles: Freedom of speech in the United States and United States free speech exceptions*

### Speech critical of the government

The Supreme Court declined to rule on the constitutionality of any federal law regarding the Free Speech Clause until the 20th century. For example, the Supreme Court never ruled on the Alien and Sedition Acts of 1798, legislation by President John Adams' Federalist Party to ban seditious libel; three of the Supreme Court's justices presided over resulting sedition trials without indicating any reservations.[37] The leading critics of the law, Vice President Thomas Jefferson and James Madison, argued for the Acts' unconstitutionality based on the First Amendment and other Constitutional provisions.[38] Jefferson succeeded Adams as president, in part due to the unpopularity of the latter's sedition prosecutions; he and

his party quickly overturned the Acts and pardoned those imprisoned by them.[39] In the majority opinion in *New York Times Co. v. Sullivan* (1964),[40] Justice William J. Brennan, Jr. noted the importance of this public debate as a precedent in First Amendment law and ruled that the Acts had been unconstitutional: "Although the Sedition Act was never tested in this Court, the attack upon its validity has carried the day in the court of history."[41][42]

Inscription of the First Amendment (December 15, 1791) in front of Independence Hall in Philadelphia

### World War I

During the patriotic fervor of World War I, the Espionage Act of 1917 imposed a maximum sentence of twenty years for anyone who caused or attempted to cause "insubordination, disloyalty, mutiny, or refusal of duty in the military or naval forces of the United States." Hundreds of prosecutions followed.[43] In 1919, the Supreme Court heard four appeals resulting from these cases: *Schenck v. United States*, *Debs v. United States*, *Frohwerk v. United States*, and *Abrams v. United States*.[44]

Justice Oliver Wendell Holmes formulated the clear and present danger test for free speech cases.

In the first of these cases, Socialist Party of America official Charles Schenck had been convicted under the Espionage Act for publishing leaflets urging resistance to the draft.[45] Schenck appealed, arguing that the Espionage Act violated the Free Speech Clause of the First Amendment. In *Schenck v. United States*, the Supreme Court unanimously rejected Schenck's appeal and affirmed his conviction.[46] Justice Oliver Wendell Holmes, Jr., writing for the Court, explained that "the question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent."[47] One week later, in *Frohwerk v. United States*, the court again upheld an Espionage Act conviction, this time that of a journalist who had criticized U.S. involvement in foreign wars.[48]

The "clear and present danger" test of *Schenck* was elaborated in *Debs v. United States*.[49] On June 16, 1918, Eugene V. Debs, a political activist, delivered a speech in Canton, Ohio, in which he spoke of "most loyal comrades were paying the penalty to the working class – these being Wagenknecht, Baker and Ruthenberg, who had been convicted of aiding and abetting another in failing to register for the draft."[50] Following his speech, Debs was charged and convicted under the Espionage Act. In upholding his conviction, the Court reasoned that although he had not spoken any words that posed a "clear and present danger", taken in context, the speech had a "natural tendency and a probable effect to obstruct the recruiting services".[51][52] In *Abrams v. United States*, four Russian refugees appealed their conviction for throwing leaflets from a building in New York; the leaflets argued against President Woodrow Wilson's intervention in Russia against the Bolshevik Revolution. The majority upheld their conviction, but Holmes and Justice Louis Brandeis dissented, holding that the government had demonstrated no "clear and present danger" in the four's political advocacy.[48]

### Extending protections

The Supreme Court denied a number of Free Speech Clause claims throughout the 1920s, including the appeal of a labor organizer, Benjamin Gitlow, who had been convicted after distributing a manifesto calling for a "revolutionary dictatorship of the proletariat".[53] In *Gitlow v. New York* (1925), the Court upheld the conviction, but a majority also found that the First Amendment applied to state laws as well as federal laws, via the Equal Protection Clause of the Fourteenth Amendment.[54][55] Holmes and Brandeis dissented in several more cases in this decade, however, advancing the argument that the Free Speech Clause protected a far greater range of political speech than the Court had previously acknowledged. In *Whitney v. California* (1927),[56] in which Communist Party USA organizer Charlotte Anita Whitney had been arrested for "criminal syndicalism", Brandeis wrote a dissent in which he argued for broader protections for political speech:

Justice Louis Brandeis wrote several dissents in the 1920s upholding free speech claims.

> Those who won our independence ... believed that freedom to think as you will and to speak as you think are means indispensable to the discovery and spread of political truth; that without free speech and assembly discussion would be futile; that with them, discussion affords ordinarily adequate protection against the dissemination of noxious doctrine; that the greatest menace to freedom is an inert people; that public discussion is a political duty; and that this should be a fundamental principle of the American government.[57]

In *Herndon v. Lowry* (1937), the Court heard the case of African American Communist Party organizer Angelo Herndon, who had been convicted under the Slave Insurrection Statute for advocating black rule in the southern United States. In a 5-4 decision, the Court reversed Herndon's conviction, upholding Holmes' "clear and present danger" test for the first time and arguing that the state of Georgia had not demonstrated that Herndon's actions met this standard.[58]

In 1940, Congress enacted the Smith Act, making it illegal to advocate "the propriety of overthrowing or destroying any government in the United States by force and violence."[59] The statute provided law enforcement a tool to combat Communist leaders. After Eugene Dennis was convicted in the Foley Square trial for attempting to organize a Communist Party, he petitioned for *certiorari*, which the Supreme Court granted.[60] In *Dennis v. United States* (1951),[61] the Court upheld the law 6-2.[a][62] Chief Justice Fred M. Vinson relied on Holmes' "clear and present danger" test as adapted by Learned Hand: "In each case [courts] must ask whether the gravity of the 'evil,' discounted by its improbability, justifies such invasion of free speech as necessary to avoid the danger."[63] Clearly, Vinson suggested, clear and present danger did not intimate "that before the Government may act, it must wait until the *putsch* is about to be executed, the plans have been laid and the signal is awaited."[64] In a concurring opinion, Justice Felix Frankfurter proposed a "balancing test", which soon supplanted the "clear and present danger" test:

> The demands of free speech in a democratic society as well as the interest in national security are better served by candid and informed weighing of the competing interests, within the

confines of the judicial process.[62]

In *Yates v. United States* (1957), the Supreme Court limited the Smith Act prosecutions to "advocacy of action" rather than "advocacy in the realm of ideas". Advocacy of abstract doctrine remained protected while speech explicitly inciting the forcible overthrow of the government was punishable under the Smith Act.[65][66]

During the Vietnam War, the Court's position on public criticism of the government changed drastically. Though the Court upheld a law prohibiting the forgery, mutilation, or destruction of draft cards in *United States v. O'Brien* (1968),[67] fearing that burning draft cards would interfere with the "smooth and efficient functioning" of the draft system,[68][69] the next year, the court handed down its decision in *Brandenburg v. Ohio* (1969),[70] expressly overruling *Whitney v. California*.[71] Now the Supreme Court referred to the right to speak openly of violent action and revolution in broad terms:

> [Our] decisions have fashioned the principle that the constitutional guarantees of free speech and free press do not allow a State to forbid or proscribe advocacy of the use of force or law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or cause such action.[72]

*Brandenburg* discarded the "clear and present danger" test introduced in *Schenck* and further eroded *Dennis*.[73][74] In *Cohen v. California* (1971),[75] the Court voted 5-4 to reverse the conviction of a man wearing a jacket reading "Fuck the Draft" in the corridors of a Los Angeles County courthouse. Justice John Marshall Harlan wrote in the majority opinion that Cohen's jacket fell in the category of protected political speech despite the use of an expletive: "one man's vulgarity is another man's lyric."[76]

## Political speech

### Anonymous speech

In *Talley v. California* (1960),[77] the Court struck down a Los Angeles city ordinance that made it a crime to distribute anonymous pamphlets. Justice Hugo Black wrote in the majority opinion: "There can be no doubt that such an identification requirement would tend to restrict freedom to distribute information and thereby freedom of expression ... Anonymous pamphlets, leaflets, brochures and even books have played an important role in the progress of mankind."[78] In *McIntyre v. Ohio Elections Commission* (1995),[79] the Court struck down an Ohio statute that made it a crime to distribute anonymous campaign literature.[80] However, in *Meese v. Keene* (1987),[81] the Court upheld the Foreign Agents Registration Act of 1938, under which several Canadian films were defined as "political propaganda", requiring their sponsors to be identified.[82]

### Campaign finance

*Main article: Campaign finance reform in the United States*

In *Buckley v. Valeo* (1976),[83] the Supreme Court reviewed the Federal Election Campaign Act of 1971 and related laws, which restricted the monetary contributions that may be made to political campaigns and expenditure by candidates. The Court affirmed the constitutionality of limits on campaign contributions,

stating that they "serve[d] the basic governmental interest in safeguarding the integrity of the electoral process without directly impinging upon the rights of individual citizens and candidates to engage in political debate and discussion."[84] However, the Court overturned the spending limits, which it found imposed "substantial restraints on the quantity of political speech."[85][86]

U.S. Senator Mitch McConnell, plaintiff in *McConnell v. Federal Election Commission*

The court again scrutinized campaign finance regulation in *McConnell v. Federal Election Commission* (2003).[87] The case centered on the Bipartisan Campaign Reform Act of 2002 (BCRA), a federal law that imposed new restrictions on campaign financing. The Supreme Court upheld provisions which barred the raising of soft money by national parties and the use of soft money by private organizations to fund certain advertisements related to elections. However, the Court struck down the "choice of expenditure" rule, which required that parties could either make coordinated expenditures for all its candidates, or permit candidates to spend independently, but not both, which the Court agreed "placed an unconstitutional burden on the parties' right to make unlimited independent expenditures."[88] The Court also ruled that the provision preventing minors from making political contributions was unconstitutional, relying on *Tinker v. Des Moines Independent Community School District.*

In *Federal Election Commission v. Wisconsin Right to Life, Inc.* (2007),[89] the Court sustained an "as applied" challenge to BCRA, holding that issue ads may not be banned from the months preceding a primary or general election. In *Davis v. Federal Election Commission* (2008),[90] the Supreme Court declared the "Millionaire's Amendment" provisions of the BCRA to be unconstitutional. The Court held that easing BCRA restrictions for an opponent of a self-financing candidate spending at least $350,000 of his or her own money violated the freedom of speech of the self-financing candidate.[91]

In *Citizens United v. Federal Election Commission* (2010),[92] the Court ruled that the BCRA's federal restrictions on electoral advocacy by corporations or unions were unconstitutional for violating the Free Speech Clause of the First Amendment. The Court overruled *Austin v. Michigan Chamber of Commerce* (1990),[93] which had upheld a state law that prohibited corporations from using treasury funds to support or oppose candidates in elections did not violate the First or Fourteenth Amendments. The Court also overruled the portion of *McConnell* that upheld such restrictions under the BCRA.[94] In other words, the ruling was considered to hold that "political spending is a form of protected speech under the First Amendment".[95]

### Flag desecration

The divisive issue of flag desecration as a form of protest first came before the Supreme Court in *Street v. New York* (1969).[96] In response to hearing an erroneous report of the murder of civil rights activist James Meredith, Sidney Street burned a 48-star U.S. flag. Street was arrested and charged with a New York state law making it a crime "publicly [to] mutilate, deface, defile, or defy, trample upon, or cast contempt upon either by words or act [any flag of the United States]."[97] In a 5–4 decision, the Court, relying on *Stromberg v. California* (1931),[98] found that because the provision of the New York law criminalizing "words"

Case 3:13-cv-01238-CAB-BLM Document 5-8 Filed 09/10/13 Page 11 of 28

against the flag was unconstitutional, and the trial did not sufficiently demonstrate that he was convicted solely under the provisions not yet deemed unconstitutional, the conviction was unconstitutional. The Court, however, "resist[ed] the pulls to decide the constitutional issues involved in this case on a broader basis" and left the constitutionality of flag-burning unaddressed.[99][100]

The ambiguity with regard to flag-burning statutes was eliminated in *Texas v. Johnson* (1989).[101] In that case, Gregory Lee Johnson burned an American flag at a demonstration during the 1984 Republican National Convention in Dallas, Texas. Charged with violating a Texas law prohibiting the vandalizing of venerated objects, Johnson was convicted, sentenced to one year in prison, and fined $2,000. The Supreme Court reversed his conviction in a 5–4 vote. Justice William J. Brennan, Jr. wrote in the decision that "if there is a bedrock principle underlying the First Amendment, it is that government may not prohibit the expression of an idea simply because society finds the idea offensive or disagreeable."[102] Congress then passed a federal law barring flag burning, but the Supreme Court struck it down as well in *United States v. Eichman* (1990).[103][104] A Flag Desecration Amendment to the U.S. Constitution has been proposed repeatedly in Congress since 1989, and in 2006 failed to pass the Senate by a single vote.[105]

#### Falsifying military awards

While the unauthorized wear or sale of the Medal of Honor has been a punishable offense under federal law since the early 20th century,[106][107] the Stolen Valor Act made criminal the act of not only wearing, but also verbally claiming entitlement to military awards that a person did not in fact earn.[108] In *United States v. Alvarez* (2012), the Supreme Court struck down the Stolen Valor Act, ruling that the law violated the right to free speech for the government to punish people for making false claims regarding military service or honors.[109] The decision was a 6-3 ruling, but the six justices in the majority could not agree on a single rationale for it.[110]

## Commercial speech

Commercial speech is speech done on behalf of a company or individual for the purpose of making a profit. Unlike political speech, the Supreme Court does not afford commercial speech full protection under the First Amendment. To effectively distinguish commercial speech from other types of speech for purposes of litigation, the Court uses a list of four indicia:[111]

1. The contents do "no more than propose a commercial transaction."
2. The contents may be characterized as advertisements.
3. The contents reference a specific product.
4. The disseminator is economically motivated to distribute the speech.

Alone, each indicium does not compel the conclusion that an instance of speech is commercial; however, "[t]he combination of *all* these characteristics...provides strong support for...the conclusion that the [speech is] properly characterized as commercial speech."[112]

In *Valentine v. Chrestensen* (1942),[113] the Court upheld a New York City ordinance forbidding the "distribution in the streets of commercial and business advertising matter."[114] Writing for a unanimous court, Justice Owen Roberts explained:

> This court has unequivocally held that streets are proper places for the exercise of the freedom of communicating information and disseminating opinion and that, though the states and municipalities may appropriately regulate the privilege in the public interest, they may not unduly burden or proscribe its employment in their public thoroughfares. We are equally clear that the Constitution imposes no such restraint on government as respects purely commercial advertising.[115]

In *Virginia State Pharmacy Board v. Virginia Citizens Consumer Council* (1976),[116] the Court overruled *Valentine* and ruled that commercial speech was entitled to First Amendment protection:

> What is at issue is whether a State may completely suppress the dissemination of concededly truthful information about entirely lawful activity, fearful of that information's effect upon its disseminators and its recipients... [W]e conclude that the answer to this one is in the negative.[117]

In *Ohralik v. Ohio State Bar Association* (1978),[118] the Court ruled that commercial speech was not protected by the First Amendment as much as other types of speech:

> We have not discarded the "common-sense" distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech. To require a parity of constitutional protection for commercial and noncommercial speech alike could invite a dilution, simply by a leveling process, of the force of the [First] Amendment's guarantee with respect to the latter kind of speech.[119]

In *Central Hudson Gas & Electric Corp. v. Public Service Commission* (1980),[120] the Court clarified what analysis was required before the government could justify regulating commercial speech:

1. Is the expression protected by the First Amendment? Lawful? Misleading? Fraud?
2. Is the asserted government interest substantial?
3. Does the regulation directly advance the governmental interest asserted?
4. Is the regulation more extensive than is necessary to serve that interest?

Six years later, the U.S. Supreme Court, applying the *Central Hudson* standards in *Posadas de Puerto Rico Associates v. Tourism Company of Puerto Rico* (1986),[121] affirmed the Supreme Court of Puerto Rico's conclusion that Puerto Rico's *Games of Chance Act of 1948*, including the regulations thereunder, was not facially unconstitutional. The lax interpretation of *Central Hudson* adopted by *Posadas* was soon restricted under *44 Liquormart, Inc. v. Rhode Island* (1996),[122] when the Court invalidated a Rhode Island law prohibiting the publication of liquor prices.

## School speech

In *Tinker v. Des Moines Independent Community School District* (1969),[123] the Supreme Court extended free speech rights to students in school. The case involved several students who were punished for wearing black armbands to protest the Vietnam War. The Court ruled that the school could not restrict symbolic speech that did not "materially and substantially" interrupt school activities.[124] Justice Abe Fortas wrote,

> [S]chools may not be enclaves of totalitarianism. School officials do not possess absolute

> authority over their students. Students ... are possessed of fundamental rights which the State must respect, just as they themselves must respect their obligations to the State.[125]

In *Healy v. James* (1972), the Court ruled that Central Connecticut State College's refusal to recognize a campus chapter of Students for a Democratic Society was unconstitutional, reaffirming *Tinker*.[126]

However, since 1969 the Court has also placed several limitations on *Tinker* interpretations. In *Bethel School District v. Fraser* (1986),[127] the Court ruled that a student could be punished for his sexual-innuendo-laced speech before a school assembly and, in *Hazelwood v. Kuhlmeier* (1988),[128] the Court found that school newspapers enjoyed fewer First Amendment protections and are subject to school censorship.[129] In *Morse v. Frederick* (2007),[130] the Court ruled that schools could, consistent with the First Amendment, restrict student speech at school-sponsored events, even events away from school grounds, if students promote "illegal drug use."[131]

## Obscenity

*Main article: United States obscenity law*

The federal government and the states have long been permitted to limit obscenity or pornography. While the Supreme Court has generally refused to give obscenity any protection under the First Amendment, pornography is subject to little regulation. However, the definitions of obscenity and pornography have changed over time.[9]

Justice Potter Stewart wrote that while he could not precisely define pornography, "I know it when I see it."

In *Rosen v. United States* (1896), the Supreme Court adopted the same obscenity standard as had been articulated in a famous British case, *Regina v. Hicklin* (1868).[132] The *Hicklin* test defined material as obscene if it tended "to deprave or corrupt those whose minds are open to such immoral influences, and into whose hands a publication of this sort may fall."[133] In the early twentieth century, literary works including *An American Tragedy* (Theodore Dreiser, 1925) and *Lady Chatterley's Lover* (D.H. Lawrence, 1928) were banned for obscenity. In the federal district court case *United States v. One Book Called Ulysses* (1933), Judge John M. Woolsey established a new standard to evaluate James Joyce's novel *Ulysses* (1922), stating that works must be considered in their entirety, rather than declared obscene on the basis of an individual part of the work.[134]

The Supreme Court ruled in *Roth v. United States* (1957)[135] that the First Amendment did not protect obscenity.[134] It also ruled that the *Hicklin* test was inappropriate; instead, the *Roth* test for obscenity was "whether to the average person, applying contemporary community standards, the dominant theme of the material, taken as a whole, appeals to the prurient interest."[136] This definition proved hard to apply, however, and in the following decade, members of the Court often reviewed films individually in a court building screening room to determine if they should be considered obscene.[137] Justice Potter Stewart, in *Jacobellis v. Ohio* (1964),[138] famously stated that, although he could not precisely define pornography, "I

know it when I see it".[139]

The *Roth* test was expanded when the Court decided *Miller v. California* (1973).[140] Under the *Miller* test, a work is obscene if:

> (a)...'the average person, applying contemporary community standards' would find the work, as a whole, appeals to the prurient interest,...(b)...the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law, and (c)...the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.[141]

Note that "community" standards—not national standards—are applied whether the material appeals to the prurient interest, leaving the question of obscenity to local authorities.[134] Child pornography is not subject to the *Miller* test, as the Supreme Court decided in *New York v. Ferber* (1982) and *Osborne v. Ohio* (1990),[142][143] ruling that the government's interest in protecting children from abuse was paramount.[144][145]

Personal possession of obscene material in the home may not be prohibited by law. In *Stanley v. Georgia* (1969),[146] the Court ruled that "[i]f the First Amendment means anything, it means that a State has no business telling a man, sitting in his own house, what books he may read or what films he may watch."[147] However, it is constitutionally permissible for the government to prevent the mailing or sale of obscene items, though they may be viewed only in private. *Ashcroft v. Free Speech Coalition* (2002)[148] further upheld these rights by invalidating the Child Pornography Prevention Act of 1996, holding that, because the act "[p]rohibit[ed] child pornography that does not depict an actual child" it was overly broad and unconstitutional under the First Amendment[149] and that:

> First Amendment freedoms are most in danger when the government seeks to control thought or to justify its laws for that impermissible end. The right to think is the beginning of freedom, and speech must be protected from the government because speech is the beginning of thought.[150]

In *United States v. Williams* (2008),[151] the Court upheld the PROTECT Act of 2003, ruling that prohibiting offers to provide and requests to obtain child pornography did not violate the First Amendment, even if a person charged under the Act did not possess child pornography.[152][153]

### Memoirs of convicted criminals

In some states, there are Son of Sam laws prohibiting convicted criminals from publishing memoirs for profit.[154] These laws were a response to offers to David Berkowitz to write memoirs about the murders he committed. The Supreme Court struck down a law of this type in New York as a violation of the First Amendment in the case *Simon & Schuster v. Crime Victims Board* (1991).[155] That statute did not prohibit publication of a memoir by a convicted criminal. Instead, it provided that all profits from the book were to be put in escrow for a time. The interest from the escrow account was used to fund the New York State Crime Victims Board – an organization that pays the medical and related bills of victims of crime. Similar laws in other states remain unchallenged.[156]

### Defamation

*Main article: United States defamation law*

American tort liability for defamatory speech or publications traces its origins to English common law. For the first two hundred years of American jurisprudence, the basic substance of defamation law continued to resemble that existing in England at the time of the Revolution. An 1898 American legal textbook on defamation provides definitions of libel and slander nearly identical to those given by Blackstone and Coke. An action of slander required the following:[157]

Justice William J. Brennan, Jr. wrote the landmark decision *New York Times Co. v. Sullivan*, requiring the demonstration of "actual malice" in libel suits against public figures.

1. Actionable words, such as those imputing the injured party: is guilty of some offense, suffers from a contagious disease or psychological disorder, is unfit for public office because of moral failings or an inability to discharge his or her duties, or lacks integrity in profession, trade or business;
2. That the charge must be false;
3. That the charge must be articulated to a third person, verbally or in writing;
4. That the words are not subject to legal protection, such as those uttered in Congress; and
5. That the charge must be motivated by malice.

An action of libel required the same five general points as slander, except that it specifically involved the publication of defamatory statements.[158] For certain criminal charges of libel, such as seditious libel, the truth or falsity of the statements was immaterial, as such laws were intended to maintain public support of the government and true statements could damage this support even more than false ones.[159] Instead, libel placed specific emphasis on the result of the publication. Libelous publications tended to "degrade and injure another person" or "bring him into contempt, hatred or ridicule."[158]

Concerns that defamation under common law might be incompatible with the new republican form of government caused early American courts to struggle between William Blackstone's argument that the punishment of "dangerous or offensive writings...[was] necessary for the preservation of peace and good order, of government and religion, the only solid foundations of civil liberty" and the argument that the need for a free press guaranteed by the Constitution outweighed the fear of what might be written.[159] Consequently, very few changes were made in the first two centuries after the ratification of the First Amendment.

The Supreme Court's ruling in *New York Times Co. v. Sullivan* (1964)[40] fundamentally changed American defamation law. The case redefined the type of "malice" needed to sustain a libel case. Common law malice consisted of "ill-will" or "wickedness". Now, a public officials seeking to sustain a civil action against a tortfeasor needed to prove by "clear and convincing evidence" actual malice. The case involved an advertisement published in *The New York Times* indicating that officials in Montgomery, Alabama had acted violently in suppressing the protests of African-Americans during the civil rights movement. The Montgomery Police Commissioner, L. B. Sullivan, sued the *Times* for libel, stating that the advertisement damaged his reputation. The Supreme Court unanimously overruled the $500,000 judgment against the *Times*. Justice Brennan suggested that public officials may sue for libel only if the publisher published the statements in question with "actual malice" — "knowledge that it was false or with reckless disregard of

whether it was false or not."[160][161]

While actual malice standard applies to public officials and public figures,[162] in *Philadelphia Newspapers v. Hepps* (1988),[163] the Court found that, with regard to private individuals, the First Amendment does "not necessarily force any change in at least some features of the common-law landscape."[164] In *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.* (1985)[165] the Court ruled that "actual malice" need not be shown in cases involving private individuals, holding that "[i]n light of the reduced constitutional value of speech involving no matters of public concern...the state interest adequately supports awards of presumed and punitive damages – even absent a showing of 'actual malice.'"[166][167] In *Gertz v. Robert Welch, Inc.*, the Court ruled that a private individual had to prove actual malice only to be awarded punitive damages, but not to seek actual damages.[168][169] In*Hustler Magazine v. Falwell* (1988),[170] the Court extended the "actual malice" standard to intentional infliction of emotional distress in a ruling which protected parody, in this case a fake advertisement in *Hustler* suggesting that evangelist Jerry Falwell's first sexual experience had been with his mother in an outhouse. Since Falwell was a public figure, the Court ruled that "importance of the free flow of ideas and opinions on matters of public interest and concern" was the paramount concern, and reversed the judgement Falwell had won against *Hustler* for emotional distress.[171]

In *Milkovich v. Lorain Journal Co.* (1990),[172] the Court ruled that the First Amendment offers no wholesale exception to defamation law for statements labeled "opinion," but instead that a statement must be provably false (falsifiable) before it can be the subject of a libel suit.[173]

### Private action

State constitutions provide free speech protections similar to those of the U.S. Constitution. In a few states, such as California, a state constitution has been interpreted as providing more comprehensive protections than the First Amendment. The Supreme Court has permitted states to extend such enhanced protections, most notably in *Pruneyard Shopping Center v. Robins*.[174] In that case, the Court unanimously ruled that while the First Amendment may allow private property owners to prohibit trespass by political speakers and petition-gatherers, California was permitted to restrict property owners whose property is equivalent to a traditional public forum (often shopping malls and grocery stores) from enforcing their private property rights to exclude such individuals.[175] However, the Court did maintain that shopping centers could impose "reasonable restrictions on expressive activity."[176] Subsequently, New Jersey, Colorado, Massachusetts and Puerto Rico courts have adopted the doctrine;[177][178] California's courts have repeatedly reaffirmed it.[179]

## Freedom of the press

*Main article: Freedom of the press in the United States*

The Free Press Clause protects the freedom to publish. In *Lovell v. City of Griffin* (1938),[180] Chief Justice Charles Evans Hughes defined "press" as "every sort of publication which affords a vehicle of information and opinion."[181] This right has been extended to media including newspapers, books, plays, movies, and video games.[182] While the question remains whether bloggers or people posting on social media like Facebook and Twitter are covered by the Free Press Clause, they are covered by the Free Speech Clause.[183]

A landmark decision for press freedom came in *Near v. Minnesota* (1931),[184] in which the Supreme Court rejected prior restraint (pre-publication censorship). In this case, the Minnesota legislature passed a statute allowing courts to shut down "malicious, scandalous and defamatory newspapers", allowing a defense of truth only in cases where the truth had been told "with good motives and for justifiable ends".[185] In a 5-4 decision, the Court applied the Free Press Clause to the states, rejecting the statute as unconstitutional. Hughes quoted Madison in the majority decision, writing, "The impairment of the fundamental security of life and property by criminal alliances and official neglect emphasizes the primary need of a vigilant and courageous press".[186]

However, *Near* also noted an exception, allowing prior restraint in cases such as "publication of sailing dates of transports or the number or location of troops". [187] This exception was a key point in another landmark case four decades later: *New York Times Co. v. United States* (1971),[188] in which the administration of President Richard M. Nixon sought to ban the publication of the Pentagon Papers, classified government documents about the Vietnam War secretly copied by analyst Daniel Ellsberg. The Court found 6-3 that the U.S. had not met the heavy burden of proof required for prior restraint. Justice Brennan, drawing on *Near* in a concurrent opinion, wrote that "only governmental allegation and proof that publication must inevitably, directly, and immediately cause the occurrence of an evil kindred to imperiling the safety of a transport already at sea can support even the issuance of an interim restraining order." Justices Black and Douglas went still further, writing that prior restraints were never justified.[189]



The leak of the Pentagon Papers by Daniel Ellsberg (pictured here in 2006) led to *New York Times Co. v. United States* (1971), a landmark press freedom decision.

The courts have rarely treated content-based regulation of journalism with any sympathy. In *Miami Herald Publishing Co. v. Tornillo* (1974),[190] the Court unanimously struck down a state law requiring newspapers criticizing political candidates to publish their responses. The state claimed that the law had been passed to ensure journalistic responsibility. The Supreme Court found that freedom, but not responsibility, is mandated by the First Amendment and so it ruled that the government may not force newspapers to publish that which they do not desire to publish.[191]

Content-based regulation of television and radio, however, have been sustained by the Supreme Court in various cases. Since there is a limited number of frequencies for non-cable television and radio stations, the government licenses them to various companies. However, the Supreme Court has ruled that the problem of scarcity does not allow the raising of a First Amendment issue. The government may restrain broadcasters, but only on a content-neutral basis. In *Federal Communications Commission v. Pacifica Foundation*,[192] the Supreme Court upheld the Federal Communications Commission's authority to restrict the use of "indecent" material in broadcasting.

State governments retain the right to tax newspapers, just as they may tax other commercial products. Generally, however, taxes that focus exclusively on newspapers have been found unconstitutional. In *Grosjean v. American Press Co.* (1936),[193] the Court invalidated a state tax on newspaper advertising revenues, holding that the role of the press in creating "informed public opinion" was vital.[194] Similarly,

some taxes that give preferential treatment to the press have been struck down. In *Arkansas Writers' Project v. Ragland* (1987),[195] for instance, the Court invalidated an Arkansas law exempting "religious, professional, trade and sports journals" from taxation since the law amounted to the regulation of newspaper content. In *Leathers v. Medlock* (1991),[196] the Supreme Court found that states may treat different types of the media differently, such as by taxing cable television, but not newspapers. The Court found that "differential taxation of speakers, even members of the press, does not implicate the First Amendment unless the tax is directed at, or presents the danger of suppressing, particular ideas."[197]

In *Branzburg v. Hayes* (1972),[198] the Court ruled that the First Amendment did not give a journalist the right to refuse a subpoena from a grand jury. The issue decided in the case was whether a journalist could refuse to "appear and testify before state and Federal grand juries" basing the refusal on the belief that such appearance and testimony "abridges the freedom of speech and press guaranteed by the First Amendment."[199] The 5–4 decision was that such a protection was not provided by the First Amendment. However, a concurring opinion by Justice Lewis F. Powell, in which he stated that a claim for press privilege "should be judged on its facts by the striking of a proper balance between freedom of the press", has been frequently cited by lower courts since the decision.[200]

# Petition and assembly

*Main articles: Right to petition in the United States and Freedom of assembly*

The Petition Clause protects the right "to petition the government for a redress of grievances."[13] The Petition Clause first came to prominence in the 1830s, when Congress established the gag rule barring anti-slavery petitions from being heard; the rule was overturned by Congress several years later. Petitions against the Espionage Act of 1917 resulted in imprisonments. The Supreme Court did not rule on either issue.[201]

Chief Justice Morrison Waite ruled in *United States v. Cruikshank* that the right of assembly was a secondary right to the right to petition.

In *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508 (1972), the U.S. Court stated that the right to petition encompass "the approach of citizens or groups of them to administrative agencies (which are both creatures of the legislature, and arms of the executive) and to courts, the third branch of Government. Certainly the right to petition extends to all departments of the Government. The right of access to the courts is indeed but one aspect of the right of petition." Today thus this right encompasses petitions to all three branches of the federal government—the Congress, the executive and the judiciary—and has been extended to the states through incorporation.[202][201] According to the Supreme Court, "redress of grievances" is to be construed broadly: it includes not solely appeals by the public to the government for the redressing of a grievance in the traditional sense, but also, petitions on behalf of private interests seeking personal gain.[203] The right not only protects demands for "a redress of grievances" but also demands for government action.[201][203] The petition clause inludes according to the Supreme Court the opportunity to institute non-frivolous lawsuits and mobilize popular support to change existing laws in a peaceful manner.[202]

In *Borough of Duryea v. Guarnieri* (2011),[204] the Supreme Court stated regarding the Free Speech Clause and the Petition Clause:

> It is not necessary to say that the two Clauses are identical in their mandate or their purpose and effect to acknowledge that the rights of speech and petition share substantial common ground... Both speech and petition are integral to the democratic process, although not necessarily in the same way. The right to petition allows citizens to express their ideas, hopes, and concerns to their government and their elected representatives, whereas the right to speak fosters the public exchange of ideas that is integral to deliberative democracy as well as to the whole realm of ideas and human affairs. Beyond the political sphere, both speech and petition advance personal expression, although the right to petition is generally concerned with expression directed to the government seeking redress of a grievance.[13]

The right of assembly was originally distinguished from the right to petition. In *United States v. Cruikshank* (1875),[205] the Supreme Court held that "the right of the people peaceably to assemble for the purpose of petitioning Congress for a redress of grievances, or for anything else connected with the powers or duties of the National Government, is an attribute of national citizenship, and, as such, under protection of, and guaranteed by, the United States. The very idea of a government, republican in form, implies a right on the part of its citizens to meet peaceably for consultation in respect to public affairs and to petition for a redress of grievances."[206] Justice Morrison Waite's opinion for the Court carefully distinguished the right to peaceably assemble as a secondary right, while the right to petition was labeled to be a primary right. Later cases, however, paid less attention to these distinctions.[201]

In two 1960s decisions collectively known as forming the Noerr-Pennington doctrine,[b] the Court established that the right to petition prohibited the application of antitrust law to statements made by private entities before public bodies: a monopolist may freely go before the city council and encourage the denial of its competitor's building permit without being subject to Sherman Act liability.[207]

# Freedom of association

*Further information: Freedom of association*

Although the First Amendment does not explicitly mention freedom of association, the Supreme Court ruled, in *National Association for the Advancement of Colored People v. Alabama* (1958),[208] that this freedom was protected by the Amendment and that privacy of membership was an essential part of this freedom.[209] The U.S. Supreme Could decided in *Roberts v. United States Jaycees* (1984) that "implicit in the right to engage in activities protected by the First Amendment" is "a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends."[210] In *Roberts* the Court held that associations may not exclude people for reasons unrelated to the group's expression, such as gender.[211]

However, in *Hurley v. Irish-American Gay, Lesbian, and Bisexual Group of Boston* (1995),[212] the Court ruled that a group may exclude people from membership if their presence would affect the group's ability to advocate a particular point of view.[213] Likewise, in *Boy Scouts of America v. Dale* (2000),[214] the Court ruled that a New Jersey law, which forced the Boy Scouts of America to admit an openly gay member, to be an unconstitutional abridgment of the Boy Scouts' right to free association.[215]

## See also

- Bill of Rights 1689
- Censorship in the United States
- Freedom of thought
- Free speech zones
- List of amendments to the United States Constitution
- List of United States Supreme Court cases involving the First Amendment
- Magna Carta
- Marketplace of ideas
- Military expression
- Virginia Statute for Religious Freedom

## References

### Notes

a. ^ Justice Tom C. Clark did not participate because he had ordered the prosecutions when he was Attorney General.

b. ^ *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc* (1961) and *United Mine Workers v. Pennington* (1965)

### Citations

1. ^ "First Amendment" (http://www.law.cornell.edu/constitution/first_amendment). Cornell University Law School Legal Information Institute. Archived (http://www.webcitation.org/6GLwqnsXK) from the original on May 3, 2013. Retrieved May 3, 2013.
2. ^ Lewis 2007, pp. 6–7.
3. ^ Beeman 2009, pp. 341–43.
4. ^ Lewis 2007, pp. 7–10.
5. ^ Jasper 1999, p. 2.
6. ^ Lewis 2007, p. 10.
7. ^ "Bill of Rights" (http://www.archives.gov/exhibits/charters/bill_of_rights.html). National Archives. Archived (http://www.webcitation.org/6Fcz4pEP4) from the original on April 4, 2013. Retrieved April 4, 2013.
8. ^ "The New United States of America Adopted the Bill of Rights: December 15, 1791" (http://www.americaslibrary.gov/jb/nation/jb_nation_bofright_1.html). Library of Congress. Archived (http://www.webcitation.org/6Fcz9E2S2) from the original on April 4, 2013. Retrieved April 4, 2013.
9. ^ *a b* Eugene Volokh. "First Amendment" (http://www.britannica.com/EBchecked/topic/208044/First-Amendment/296558/The-establishment-clause). *Encyclopaedia Britannica*. Archived (http://www.webcitation.org/6Fnuw2UmQ) from the original on April 11, 2013. Retrieved April 11, 2013.
10. ^ Daniel L. Driesbach, *Thomas Jefferson and the Wall of Separation between Church and State* NYU Press 2002, unpaginated.
11. ^ *Board of Education of Kiryas Joel Village School District v. Grumet*, 512 U.S. 687 (https://supreme.justia.com/us/512/687/case.html) (1994)
12. ^ *Grumet*, at 703
13. ^ *a b c* "BOROUGH OF DURYEA, PENNSYLVANIA, et al.,<linebreak> PETITIONERS v. CHARLES J. GUARNIERI" (http://www.law.cornell.edu/supct/html/09-1476.ZO.html). Legal Information Institute, Cornell University Law School. 20 June 2011. Retrieved 26 August 2013.
14. ^ Edward Mannino: *Shaping America: the Supreme Court and American society*, University of South Carolina Press, 2000; p. 149; Daniel L. Driesbach, *Thomas Jefferson and the Wall of Separation between Church and State* NYU Press 2002, unpaginated; Chap. 7.
15. ^ "In the words of [Thomas] Jefferson, the clause against establishment of religion by law was intended to erect "a wall of separation between church and State." from the *Everson* decision (http://www.law.cornell.edu/supct

/search/display.html?terms=Everson&url=/supct/html/historics/USSC_CR_0330_0001_ZO.html)

16. ^ Warren A. Nord, *Does God Make a Difference? (http://books.google.com/books?id=qXTziqxDgEQC&pg=PT226&dq=establishment+clause+conservative+liberal&hl=en&ei=wpWsTrfdOOft0gG3s7SkDw)*, Oxford University Press, 2010.
17. ^ "Excerpts From Ruling on Use of Education Money" (http://www.nytimes.com/1998/06/11/us/excerpts-from-ruling-on-use-of-education-money.html). *The New York Times*. June 11, 1998. Archived (http://www.webcitation.org/6GLwfJJa3) from the original on May 3, 2013. Retrieved May 3, 2013.
18. ^ [a] [b] Kritzer, H. M. and Richards, M. J. (2003), "Jurisprudential Regimes and Supreme Court Decisionmaking: The Lemon Regime and Establishment Clause Cases." *Law & Society Review*, 37: 827–840. doi:10.1046/j.0023-9216.2003.03704005.x (http://dx.doi.org/10.1046%2Fj.0023-9216.2003.03704005.x)
19. ^ Freedom of Religion (http://www.lincoln.edu/criminaljustice/hr/Religion.htm)
20. ^ [a] [b] David Shultz. *Encyclopedia of the Supreme Court* (http://books.google.com/books?id=I_f6Oo9H3YsC). Infobase Publishing. p. 144 (http://books.google.com/books?id=I_f6Oo9H3YsC&pg=PA144). Retrieved December 31, 2007. "Accomodationists, on the other hand, read the establishment clause as prohibiting Congress from declaring a national religion or preferring one to another, but laws do not have to be shorn of morality and history to be declared constitutional. They apply *Lemon* only selectively because "[w]e are a religious people whose institutions presuppose a Supreme Being" as Justice DOUGLAS wrote in *ZORACH V. CLAUSON*. 343 U.S. 306 (1952)."
21. ^ Warren A. Nord. *Does God Make a Difference?* (http://books.google.com/books?id=qXTziqxDgEQC&pg=PT226&dq=establishment+clause+conservative+liberal&hl=en&ei=wpWsTrfdOOft0gG3s7SkDw&sa=X&oi=book_result&ct=result&resnum=7&ved=0CFMQ6AEwBg#v=onepage&q=establishment%20clause%20conservative%20liberal&f=false). Oxford University Press. Retrieved December 31, 2007. "First Amendment Politics: At the risk of oversimplifying a very complicated situation, I suggest that conservative justices tend to favor a weak reading of both the Free Exercise and Establishment clause, while liberals tend to favor strong readings. That is, conservative justices have been less concerned about the dangers of establishment and less concerned to protect free exercise rights, particularly of religious minorities. Liberals, by contrast, have been opposed to any possibility of a religious establishment and they have been relatively more concerned to protect the free exercise rights of minorities."
22. ^ Robert Devigne. *Recasting Conservatism: Oakeshott, Strauss, and the Response to Postmodernism* (http://books.google.com/books?id=CayIq_Ud5j0C&pg=PA108&dq=conservatives+establishment+clause&hl=en&ei=DdapTpzUE8a3tgeiltkX&sa=X&oi=book_result&ct=result&resnum=4&ved=0CEIQ6AEwAw#v=onepage&q=conservatives%20establishment%20clause&f=false). Yale University Press. Retrieved December 31, 2007. "Conservatives claim that liberals misinterpret the establishment and free exercise clauses of the First Amendment. They point to the opinion written for the Supreme Court by Hugo Black in *Everson v. Board of Education*: "The 'establishment of religion' clause of the First Amendment means at least this: neither a state nor a Federal government can set up a church. Neither can pass laws which aid one religion, aid all religions or prefer one religion over another." The establishment clause, conservatives insist, precludes the national state from promoting any religious denomination but does not prohibit state governments and local communities from developing policies that encourage general religious beliefs that do not favor a particular sect and are consistent with the secular government's goals."
23. ^ "Reynolds v. United States - 98 U.S. 145 (1878)" (http://supreme.justia.com/cases/federal/us/98/145/case.html). Justia US Supreme Court Center.
24. ^ "Cantwell v. Connecticut - 310 U.S. 296 (1940)" (http://supreme.justia.com/cases/federal/us/310/296/case.html). Justia US Supreme Court Center. Retrieved 25 August 2013.
25. ^ *Sherbert v. Verner*, 374 U.S. 398 (https://supreme.justia.com/us/374/398/case.html) (1963)
26. ^ Richard E. Morgan (January 1, 2000). "Sherbert v. Verner 374 U.S. 398 (1963)" (http://www.highbeam.com/doc/1G2-3425002298.html). *Encyclopedia of the American Constitution*. – via HighBeam Research (subscription required). Retrieved April 19, 2013.
27. ^ *Wisconsin v. Yoder*, 406 U.S. 205 (https://supreme.justia.com/us/406/205/case.html) (1972)
28. ^ Richard E. Morgan (January 1, 2000). "Wisconsin v. Yoder 406 U.S. 205 (1972)" (http://www.highbeam.com/doc/1G2-3425002736.html). *Encyclopedia of the American Constitution*. – via HighBeam Research (subscription required). Retrieved April 19, 2013.
29. ^ *Employment Division v. Smith*, 494 U.S. 872 (https://supreme.justia.com/us/494/872/case.html) (1990)

30. ^ John G. West, Jr. (January 1, 2000). "Employment Division, Department of Human Resources of Oregon v. Smith 484 U.S. 872 (1990)" (http://www.highbeam.com/doc/1G2-3425000842.html). *Encyclopedia of the American Constitution.* – via HighBeam Research (subscription required). Retrieved April 19, 2013.
31. ^ *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520 (https://supreme.justia.com/us/508/520/case.html) (1993)
32. ^ "Church of Lukumi Babalu Aye, Inc. v. City of Hialeah 1993" (http://www.highbeam.com/doc/1G2-3457000040.html). *Supreme Court Drama: Cases that Changed America.* – via HighBeam Research (subscription required). January 1, 2001. Retrieved April 19, 2013.
33. ^ *City of Boerne v. Flores*, 521 U.S. 507 (https://supreme.justia.com/us/521/507/case.html) (1997)
34. ^ Steven A. Engel (October 1, 1999). "The McCulloch theory of the Fourteenth Amendment: City of Boerne v. Flores and the original understanding of section 5" (http://www.highbeam.com/doc/1G1-58054592.html). *The Yale Law Journal.* – via HighBeam Research (subscription required). Retrieved April 19, 2013.
35. ^ *Gonzales v. UDV*, 546 U.S. 418 (https://supreme.justia.com/us/546/418/case.html) (2006)
36. ^ "Freedom of Religion" (http://www.highbeam.com/doc/1G2-2586600046.html). *American Law Yearkbook.* – via HighBeam Research (subscription required). January 1, 2006. Retrieved April 19, 2013.
37. ^ Lewis 2007, p. 15.
38. ^ Lewis 2007, pp. 16–17.
39. ^ Lewis 2007, p. 20.
40. ^ *a b* *New York Times Co. v. Sullivan*, 376 U.S. 254 (https://supreme.justia.com/us/376/254/case.html) (1964)
41. ^ *Sullivan*, at 276
42. ^ Lewis 2007, p. 53.
43. ^ Lewis 2007, p. 25.
44. ^ Lewis 2007, pp. 25–27.
45. ^ Abrams 2006, pp. 65–66.
46. ^ *Schenck v. United States*, 249 U.S. 47 (https://supreme.justia.com/us/249/47/case.html) (1919)
47. ^ *Schenck*, at 52
48. ^ *a b* Jasper 1999, p. 23.
49. ^ *Debs v. United States*, 249 U.S. 211 (https://supreme.justia.com/us/249/211/case.html) (1919)
50. ^ *Debs*, at 213
51. ^ *Debs*, at 216
52. ^ Lewis 2007, p. 27.
53. ^ Lewis 2007, p. 108.
54. ^ Jasper 1999, p. 24.
55. ^ Lewis 2007, pp. 34–35.
56. ^ *Whitney v. California*, 274 U.S. 357 (https://supreme.justia.com/us/274/357/case.html) (1927)
57. ^ Lewis 2007, p. 36.
58. ^ Jasper 1999, p. 26.
59. ^ 18 U.S.C. § 2385 (http://www.law.cornell.edu/uscode/18/2385.html)
60. ^ *Dennis*, at 497
61. ^ *Dennis v. United States* 341 U.S. 494 (https://supreme.justia.com/us/341/494/case.html) (1951)
62. ^ *a b* Jasper 1999, p. 28.
63. ^ *Dennis*, at 510
64. ^ *Dennis*, at 509
65. ^ *Yates v. United States*, 354 U.S. 298 (https://supreme.justia.com/us/354/298/case.html) (1957)
66. ^ Jasper 1999, p. 29.
67. ^ *United States v. O'Brien*, 391 U.S. 367 (https://supreme.justia.com/us/391/367/case.html) (1968)
68. ^ 50a U.S.C. § 462 (http://www.law.cornell.edu/uscode/50a/462.html)
69. ^ *O'Brien*, at 379
70. ^ *Brandenburg v. Ohio*, 395 U.S. 444 (https://supreme.justia.com/us/395/444/case.html) (1969)
71. ^ Jasper 1999, p. 32.
72. ^ *Brandenburg*, at 447
73. ^ *Brandenburg*, at 450–1
74. ^ Lewis 2007, p. 124.

75. ^ *Cohen v. California*, 403 U.S. 15 (https://supreme.justia.com/us/403/15/case.html) (1971)
76. ^ Jasper 1999, p. 46.
77. ^ *Talley v. California*, 362 U.S. 60 (https://supreme.justia.com/us/362/60/case.html) (1960)
78. ^ Chiger, Stephen J. (June 1, 2002). "Cybersmear: telecommunication's 200-year-old riddle" (http://www.highbeam.com/doc/1G1-90119545.html). *Communications and the Law.* – via HighBeam Research (subscription required). Retrieved April 11, 2013.
79. ^ *McIntyre v. Ohio Elections Commission*, 514 U.S. 334 (https://supreme.justia.com/us/514/334/case.html) (1995)
80. ^ Biskupic, Joan (October 13, 1994). "Court Hears Case on Unsigned Leaflets" (http://www.highbeam.com /doc/1P2-913993.html). *The Washington Post.* – via HighBeam Research (subscription required). Retrieved April 11, 2013.
81. ^ *Meese v. Keene*, 481 U.S. 465 (https://supreme.justia.com/us/481/465/case.html) (1987)
82. ^ Kamen, Al (April 29, 1987). "Court Upholds Government Labeling Certain Foreign Films `Propaganda'" (http://www.highbeam.com/doc/1P2-1319383.html). *The Washington Post.* – via HighBeam Research (subscription required). Retrieved April 11, 2013.
83. ^ *Buckley v. Valeo*, 424 U.S. 1 (https://supreme.justia.com/us/424/1/case.html) (1976)
84. ^ *Buckley*, at 58
85. ^ *Buckley*, at 39
86. ^ Lewis 2007, pp. 177–78.
87. ^ *McConnell v. Federal Election Commission*, 540 U.S. 93 (https://supreme.justia.com/us/540/93/case.html) (2003)
88. ^ *McConnell*, at 213
89. ^ *Federal Election Commission v. Wisconsin Right to Life, Inc.*, 551 U.S. 449 (http://www.oyez.org/cases /2000-2009/2006/2006_06_969/) (2007)
90. ^ *Davis v. Federal Election Commission*, 554 U.S. 724 (http://www.law.cornell.edu/supct/html/07-320.ZS.html) (2008)
91. ^ Samuel Gedge (June 22, 2009). "'Wholly foreign to the First Amendment': the demise of campaign finance's equalizing rationale in Davis v. Federal Election Commission" (http://www.highbeam.com /doc/1G1-204614062.html). *Harvard Journal of Law and Public Policy.* – via HighBeam Research (subscription required). Retrieved April 11, 2013.
92. ^ *Citizens United v. Federal Election Commission*, 558 U.S. ___ (http://caselaw.lp.findlaw.com/scripts/cases /clcc.html?court=US&vol=000&invol=08-205) (2010)
93. ^ *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652 (https://supreme.justia.com/us/494/652/case.html) (1990)
94. ^ See Part III of the Opinion of the Court in *Citizens United*
95. ^ "Citizens United v. Federal Election Commission" (http://www.scotusblog.com/case-files/cases/citizens-united-v-federal-election-commission/), *scotusblog.com*, n.d. Retrieved November 1, 2012.
96. ^ *Street v. New York*, 394 U.S. 576 (https://supreme.justia.com/us/394/576/case.html) (1969)
97. ^ *Street*, 394 U.S. 576, 578 (1969) (quoting the New York Penal Law, §1425, subd. 16)
98. ^ *Stromberg v. California*, 283 U.S. 359 (https://supreme.justia.com/us/283/359/case.html) (1931)
99. ^ *Street*, at 581
100. ^ Jasper 1999, p. 43.
101. ^ *Texas v. Johnson*, 491 U.S. 397 (https://supreme.justia.com/us/491/397/case.html) (1989)
102. ^ *Johnson*, at 414
103. ^ *United States v. Eichman*, 496 U.S. 310 (https://supreme.justia.com/us/496/310/case.html) (1990)
104. ^ Jasper 1999, pp. 43–44.
105. ^ Hulse, Carl and Holusha, John (June 27, 2006). "Amendment on Flag Burning Fails by One Vote in the Senate" (http://www.nytimes.com/2006/06/27/washington/27cnd-flag.html?_r=0). *The New York Times.* Archived (http://www.webcitation.org/6FdrVKuNu) from the original on April 4, 2013. Retrieved April 4, 2013.
106. ^ See Notes to 18 U.S.C. § 704 (http://www.law.cornell.edu/uscode/text/18/704), citing 42 Stat. 1286. Retrieved on June 30, 2012.
107. ^ Pub.L. 103-322, The Violent Crime Control and Law Enforcement Act of 1994, § 320109 (http://www.gpo.gov /fdsys/pkg/BILLS-103hr3355enr/pdf/BILLS-103hr3355enr.pdf) (page 318 of the PDF version). Retrieved on June 30, 2012.

108. ^ Crewdson, John (May 27, 2008). "Fake claims of war heroics a federal offense" (http://www.chicagotribune.com/news/nationworld/chi-valormay28,0,4768252.story?page=1). *Chicago Tribune*.
109. ^ Albright, Logan (June 28, 2012). "The Supreme Court that no one is talking about" (http://dailycaller.com/2012/06/28/united-states-v-alvarez-a-win-for-first-amendment/). The Daily Caller. Retrieved 31 May 2013.
110. ^ United States v. Alverez (http://www.supremecourt.gov/opinions/11pdf/11-210d4e9.pdf), Slip Opinion No. 11–210, Argued February 22, 2012—Decided June 28, 2012, Supreme Court of the United States.
111. ^ *Bolger v. Youngs Drug Products*, 463 U.S. 60 (https://supreme.justia.com/us/463/60/case.html) (1983)
112. ^ *Bolger*, at 67
113. ^ *Valentine v. Chrestensen*, 316 U.S. 52 (https://supreme.justia.com/us/316/52/case.html) (1942)
114. ^ *Valentine*, at 53
115. ^ *Valentine*, at 54
116. ^ *Virginia State Pharmacy Board v. Virginia Citizens Consumer Council*, 425 U.S. 748 (https://supreme.justia.com/us/425/748/case.html) (1976)
117. ^ *Virginia State Pharmacy Board* at 773
118. ^ *Ohralik v. Ohio State Bar Association*, 436 U.S. 447 (https://supreme.justia.com/us/436/447/case.html) (1978)
119. ^ *Ohralik*, at 455
120. ^ *Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557 (https://supreme.justia.com/us/447/557/case.html) (1980)
121. ^ *Posadas de Puerto Rico Associates v. Tourism Company of Puerto Rico*, 478 U.S. 328 (https://supreme.justia.com/us/478/328/case.html) (1986)
122. ^ *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484 (https://supreme.justia.com/us/517/484/case.html) (1996)
123. ^ *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (https://supreme.justia.com/us/393/503/case.html) (1969)
124. ^ Jasper 1999, p. 61.
125. ^ "*Tinker v. Des Moines Independent Community School District*" (http://www.law.cornell.edu/supct/html/historics/USSC_CR_0393_0503_ZO.html). Retrieved April 11, 2013.
126. ^ Jasper 1999, p. 62.
127. ^ *Bethel School District v. Fraser*, 478 U.S. 675 (https://supreme.justia.com/us/478/675/case.html) (1986)
128. ^ *Hazelwood v. Kuhlmeier*, 484 U.S. 260 (https://supreme.justia.com/us/484/260/case.html) (1988)
129. ^ Jasper 1999, pp. 62–63.
130. ^ *Morse v. Frederick*, 551 U.S. 393 (https://supreme.justia.com/us/551/393/case.html) (2007)
131. ^ Kozlowski, Dan V.; Bullard, Melissa E.; Deets, Kristen (April 1, 2009). "Uncertain Rights: Student Speech and Conflicting Interpretations of Morse v. Frederick" (http://www.highbeam.com/doc/1P3-1753810351.html). *Journalism and Mass Communication Quarterly*. – via HighBeam Research (subscription required). Retrieved April 11, 2013.
132. ^ *Regina v. Hicklin*, [1868] L. R. 3 Q. B. 360
133. ^ *Rosen*, at 43
134. ^ *a b c* "Obscenity" (http://www.law.cornell.edu/wex/obscenity). Legal Information Institute, Cornell University Law School. August 19, 2010. Archived (http://www.webcitation.org/6FmvWmnf2) from the original on April 10, 2013. Retrieved April 10, 2013.
135. ^ *Roth v. United States*, 354 U.S. 476 (https://supreme.justia.com/us/354/476/case.html) (1957)
136. ^ *Roth*, at 489
137. ^ Lewis 2007, pp. 135–36.
138. ^ *Jacobellis v. Ohio*, 378 U.S. 184 (https://supreme.justia.com/us/378/184/case.html) (1964)
139. ^ *Jacobellis*, at 197
140. ^ *Miller v. California*, 413 U.S. 15 (https://supreme.justia.com/us/413/15/case.html) (1973)
141. ^ *Miller*, at 39
142. ^ *New York v. Ferber*, 458 U.S. 747 (https://supreme.justia.com/us/458/747/case.html) (1982)
143. ^ *Osborne v. Ohio*, 495 U.S. 103 (https://supreme.justia.com/us/495/103/case.html) (1990)
144. ^ *Ferber*, at 761
145. ^ Jasper 1999, p. 51.
146. ^ *Stanley v. Georgia*, 394 U.S. 557 (https://supreme.justia.com/us/394/557/case.html) (1969)
147. ^ *Stanley*, at 565

148. ^ *Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (https://supreme.justia.com/us/535/234/case.html) (2002)
149. ^ *Free Speech Coalition*, at 240
150. ^ *Free Speech Coalition*, at 253
151. ^ *United States v. Williams*, 553 U.S. 285 (2008)
152. ^ Opinion of the Court in *Williams* (http://www.law.cornell.edu/supct/html/06-694.ZO.html)
153. ^ Craig King (June 1, 2009). "Protecting children speech that crosses the line" (http://www.highbeam.com/doc/1G1-202024472.html). *The FBI Law Enforcement Bulletin*. – via HighBeam Research (subscription required). Retrieved April 11, 2013.
154. ^ Madeline Brand (July 22, 2004). "Interview: Julie Hilden discusses laws and ethics surrounding the intellectual property rights of prisoners" (http://www.highbeam.com/doc/1P1-96711249.html). NPR – via HighBeam Research (subscription required). Retrieved April 28, 2013.
155. ^ *Simon & Schuster v. Crime Victims Board*, 502 U.S. 105 (https://supreme.justia.com/us/502/105/case.html) (1991)
156. ^ "Simon & Schuster v. Members of the New York State Crime Victims Board 1991" (http://www.highbeam.com/doc/1G2-3457000057.html). *Supreme Court Drama: Cases That Changed America*. – via HighBeam Research (subscription required). 2001. Retrieved April 10, 2013.
157. ^ Newell 1898, pp. 37–41.
158. ^ [a] [b] Newell 1898, pp. 33–37.
159. ^ [a] [b] Nelson 1994, p. 93.
160. ^ *Sullivan* at 280
161. ^ Jasper 1999, pp. 9–10.
162. ^ *Westmoreland v. CBS*, 596 F. Supp. 363 (S.D. N.Y. 1984)
163. ^ *Philadelphia Newspapers v. Hepps*, 475 U.S. 767 (https://supreme.justia.com/us/475/767/case.html) (1988)
164. ^ *Hepps* at 775
165. ^ *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.* 472 U.S. 749 (https://supreme.justia.com/us/472/749/case.html) (1985)
166. ^ *Greenmoss* at 761
167. ^ "Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc. 472 U.S. 749 (1985)" (http://www.highbeam.com/doc/1G2-3425000783.html). *Encyclopedia of the American Constitution*. – via HighBeam Research (subscription required). January 1, 2000. Retrieved April 19, 2013.
168. ^ *Gertz v. Robert Welch, Inc.* 418 U.S. 323 (https://supreme.justia.com/us/418/323/case.html) (1974)
169. ^ Leonard W. Levy (January 1, 2000). "Gertz v. Robert Welch, Inc." (http://www.highbeam.com/doc/1G2-3425001077.html). *Encyclopedia of the American Constitution*. – via HighBeam Research (subscription required). Retrieved April 19, 2013.
170. ^ *Hustler Magazine v. Falwell*, 485 U.S. 46 (https://supreme.justia.com/us/485/46/case.html) (1988)
171. ^ "Hustler Magazine v. Falwell 1988" (http://www.highbeam.com/doc/1G2-3457000024.html). *Supreme Court Drama: Cases that Changed America*. – via HighBeam Research (subscription required). January 1, 2001. Retrieved April 19, 2013.
172. ^ *Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (https://supreme.justia.com/us/497/1/case.html) (1990)
173. ^ "Milkovich v. Lorain Journal Co. 497 U.S. 1 (1990)" (http://www.highbeam.com/doc/1G2-3425001663.html). *Encyclopedia of the American Constitution*. – via HighBeam Research (subscription required). January 1, 2000. Retrieved April 19, 2013.
174. ^ *Pruneyard Shopping Center v. Robins*, 447 U.S. 74 (https://supreme.justia.com/us/447/74/case.html) (1980)
175. ^ Gregory C. Sisk (January 1, 2009). "Returning to the PruneYard: the unconstitutionality of state-sanctioned trespass in the name of speech" (http://www.highbeam.com/doc/1G1-196305310.html). *Harvard Journal of Law and Public Property*. – via HighBeam Research (subscription required). Retrieved April 19, 2013.
176. ^ *Pruneyard*, at 94
177. ^ Mulligan, Josh (2004). "Finding A Forum in the Simulated City: Mega Malls, Gated Towns, and the Promise of *Pruneyard*". *Cornell Journal of Law and Public Policy* **13**: 533, 557. ISSN 10690565 (//www.worldcat.org/issn/10690565).
178. ^ *Empresas Puertorriqueñas de Desarrollo, Inc. v. Hermandad Independiente de Empleados Telefónicos*, 150 D.P.R. 924 (2000). (http://www.ramajudicial.pr/Supremo2/2000tspr71.htm)
179. ^ *Golden Gateway Ctr. v. Golden Gateway Tenants Ass'n*, 26 Cal. 4th 1013 (http://online.ceb.com/calcases

Case 3:13-cv-01238-CAB-BLM Document 5-8 Filed 09/10/13 Page 26 of 28

/C4/26C4t1013.htm) (2001); *Costco Companies, Inc. v. Gallant*, 96 Cal. App. 4th 740 (http://online.ceb.com/calcases/CA4/96CA4t740.htm) (2002); *Fashion Valley Mall, LLC, v. National Labor Relations Board*, 42 Cal. 4th 850 (http://online.ceb.com/calcases/C4/42C4t850.htm) (2007)

180. ^ *Lovell v. City of Griffin*, 303 U.S. 444 (https://supreme.justia.com/us/303/444/case.html) (1938)
181. ^ *Lovell*, at 452
182. ^ Adam Liptak (June 27, 2011). "Justices Reject Ban on Violent Video Games for Children" (http://www.nytimes.com/2011/06/28/us/28scotus.html?pagewanted=all&_r=0). *The New York Times*. Archived (http://www.webcitation.org/6G0FPSvxX) from the original on April 19, 2013. Retrieved April 19, 2013.
183. ^ Mataconis, Doug (May 28, 2013). "Bloggers, Media Shield Laws, And The First Amendment" (http://www.outsidethebeltway.com/bloggers-media-shield-laws-and-the-first-amendment/). Outside The Beltway. Retrieved August 9, 2013.
184. ^ *Near v. Minnesota*, 283 U.S. 697 (https://supreme.justia.com/us/283/697/case.html) (1931)
185. ^ Lewis 2007, p. 43.
186. ^ Lewis 2007, pp. 44—45.
187. ^ Lewis 2007, pp. 46–47.
188. ^ *New York Times Co. v. United States*, 403 U.S. 713 (https://supreme.justia.com/us/403/713/case.html) (1971)
189. ^ Frederick Schauer (January 1, 2000). "New York Times Co. v. United States 403 U.S. 713 (1971)" (http://www.highbeam.com/doc/1G2-3425001770.html). *Encyclopedia of the American Constitution*. – via HighBeam Research (subscription required). Retrieved April 19, 2013.
190. ^ *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241 (https://supreme.justia.com/us/418/241/case.html) (1974)
191. ^ Dennis Hevesi (February 2, 2010). "Dan Paul, 85, leading lawyer for press freedom" (http://www.highbeam.com/doc/1P2-21201322.html). *The Boston Globe*. – via HighBeam Research (subscription required). Retrieved April 19, 2013.
192. ^ *Federal Communications Commission v. Pacifica Foundation*, 438 U.S. 726 (https://supreme.justia.com/us/438/726/case.html) (1978)
193. ^ *Grosjean v. American Press Co.* 297 U.S. 233 (https://supreme.justia.com/us/297/233/case.html) (1936)
194. ^ Lewis 2007, p. 46.
195. ^ *Arkansas Writers' Project v. Ragland*, 481 U.S. 221 (https://supreme.justia.com/us/481/221/case.html) (1987)
196. ^ *Leathers v. Medlock*, 499 U.S. 439 (https://supreme.justia.com/us/499/439/case.html) (1991)
197. ^ *Leathers*, at 453
198. ^ *Branzburg v. Hayes*, 408 U.S. 665 (https://supreme.justia.com/us/408/665/case.html) (1972)
199. ^ *Branzburg*, 667
200. ^ "Branzburg v. Hayes 408 U.S. 665 (1972)" (http://www.highbeam.com/doc/1G2-3425000283.html). *Encyclopedia of the American Constitution*. – via HighBeam Research (subscription required). January 1, 2000. Retrieved April 19, 2013.
201. ^ [a b c d] "Rights of Assembly & Petition - First Amendment U.S. Constitution - Findlaw" (http://caselaw.lp.findlaw.com/data/constitution/amendment01/21.html). findlaw.com. Retrieved October 5, 2012.
202. ^ [a b] "Frequently Asked Questions - Petition" (http://www.firstamendmentcenter.org/faq/frequently-asked-questions-petition). First Amendment Center. Archived (http://www.webcitation.org/6FznKpayg) from the original on April 19, 2013. Retrieved April 19, 2013.
203. ^ [a b] *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (https://supreme.justia.com/us/365/127/case.html) (1961)
204. ^ *Borough of Duryea v. Guarnieri*, 131 S.Ct. 2488 (2011)
205. ^ *United States v. Cruikshank*, 92 U.S. 542 (https://supreme.justia.com/us/92/542/case.html) (1875)
206. ^ *Cruikshank*, at 552
207. ^ William Cooney (January 1, 2003). "Competition and the Noerr-Pennington doctrine: When should political activity be barred under European community competition law?" (http://www.highbeam.com/doc/1P3-321223711.html). *The George Washington International Law Review*. – via HighBeam Research (subscription required). Retrieved April 19, 2013.
208. ^ *National Association for the Advancement of Colored People v. Alabama*, 357 U.S. 449 (https://supreme.justia.com/us/357/449/case.html) (1958)
209. ^ "National Association for the Advancement of Colored People v. Alabama 1958" (http://www.highbeam.com

/doc/1G2-3457000015.html). *Supreme Court Drama: Cases That Changed America.* – via HighBeam Research (subscription required). January 1, 2000. Retrieved April 13, 2013.

210. ^ *Roberts v. United States Jaycees*, 468 U.S. 609 (https://supreme.justia.com/us/468/609/case.html) (1984)
211. ^ Shiffrin, Seana Valentine (January 1, 2005). "What is Really Wrong with Compelled Association?" (http://www.highbeam.com/doc/1P3-834011751.html). *Northwestern University Law Review.* – via HighBeam Research (subscription required). Retrieved April 13, 2013.
212. ^ *Hurley v. Irish-American Gay, Lesbian, and Bisexual Group of Boston,* 515 U.S. 557 (https://supreme.justia.com/us/515/557/case.html) (1995)
213. ^ "Hurley v. Irish-American Gay, Lesbian, And Bisexual Group of Boston 515 U.S. 557 (1995)" (http://www.highbeam.com/doc/1G2-3425001252.html). *Encyclopedia of the American Constitution.* – via HighBeam Research (subscription required). January 1, 2000. Retrieved April 13, 2013.
214. ^ *Boy Scouts of America v. Dale*, 530 U.S. 640 (https://supreme.justia.com/us/530/640/case.html) (2000)
215. ^ "Boy Scouts of America v. Dale" (http://www.highbeam.com/doc/1G2-2587400073.html). *Gender Issues and Sexuality: Essential Primary Sources.* – via HighBeam Research (subscription required). January 1, 2006. Retrieved April 13, 2013.

**Bibliography**

- Abrams, Floyd (April 4, 2006). *Speaking freely* (http://books.google.com/books?id=eRQIMWrCfhEC). Penguin. ISBN 978-0-14-303675-3. Retrieved April 4, 2013.
- Beeman, Richard (2009). *Plain, Honest Men: The Making of the American Constitution* (http://books.google.com/books?id=2eyCX5Vrn7wC). Random House. ISBN 978-1-58836-726-6. Retrieved April 4, 2013.
- Jasper, Margaret C. (1999). *The Law of Speech and the First Amendment* (http://books.google.com/books?id=ITpDAQAAIAAJ). Oceana Publications. ISBN 978-0-379-11335-8. Retrieved April 4, 2013.</ref>
- Nelson, William Edward (1994). *Americanization of the Common Law: The Impact of Legal Change on Massachusetts Society, 1760-1830* (http://books.google.com/books?id=64S-E0fRn4YC). University of Georgia Press. ISBN 978-0-8203-1587-4. Retrieved April 19, 2013.
- Newell, Martin L. (1898). *The Law of Libel and Slander in Civil and Criminal Cases: As Administered in the Courts of the United States of America* (http://books.google.com/books?id=iXk9AAAAIAAJ). Callaghan. Retrieved April 19, 2013.
- Lewis, Anthony (2007). *Freedom for the Thought That We Hate: A Biography of the First Amendment*. Basic Books. ISBN 978-0-465-01819-2.

# Further reading

- Curtis, Michael Kent (2000). *Free Speech, "The People's Darling Privilege": Struggles for Freedom of Expression in American History*. Duke University Press. ISBN 0822325292.
- Daniel L. Dreisbach and Mark David Hall. *The Sacred Rights of Conscience: Selected Readings on Religious Liberty and Church-State Relations in the American Founding.* Indianapolis, IN: Liberty Fund Press, 2009.
- Daniel L. Dreisbach, Mark David Hall, and Jeffry Morrison. *The Forgotten Founders on Religion and Public Life* Notre Dame, IN: University of Notre Dame Press, 2009.
- Thomas I. Emerson, "Toward a General Theory of the First Amendment," *Yale Law Journal,* vol. 72, no. 5 (1963), pp. 877–956. In JSTOR.
- Godwin, Mike (2003). *Cyber Rights: Defending Free Speech in the Digital Age*. MIT Press. ISBN 0262571684.

- P. Irons, *A People's History of the Supreme Court* New York: Penguin, 1999.
- McLeod, Kembrew; Lawrence Lessig (foreword) (2007). *Freedom of Expression: Resistance and Repression in the Age of Intellectual Property*. University of Minnesota Press. ISBN 0816650314.
- J. Kilman and G. Costello (eds.), *The Constitution of the United States of America: Analysis and Interpretation.* (2000).
- Lewis, Anthony (2007). *Freedom for the Thought That We Hate: A Biography of the First Amendment*. Basic Books. pp. 173–176. ISBN 978-0-465-03917-3. OCLC 173659591 (//www.worldcat.org/oclc/173659591).
- Nicholas P. Miller, *The Religious Roots of the First Amendment: Dissenting Protestants and the Separation of Church and State.* New York: Oxford University Press, 2012.
- Nelson, Samuel P. (2005). *Beyond the First Amendment: The Politics of Free Speech and Pluralism*. The Johns Hopkins University Press. ISBN 0801881730.

# External links

- Cornell Law School – Annotated Constitution (http://www.law.cornell.edu/anncon/html/amdt1toc_user.html)
- First Amendment Center – The First Amendment Library (http://www.firstamendmentcenter.org/)
- Cohen, Henry (16 October 2009). "Freedom of Speech and Press: Exceptions to the First Amendment" (http://www.fas.org/sgp/crs/misc/95-815.pdf). *Legislative Attorney*. Congressional Research Service. Retrieved 1 January 2012.

Retrieved from "http://en.wikipedia.org/w/index.php?title=First_Amendment_to_the_United_States_Constitution&oldid=570360451"
Categories: 1791 in American politics | 1791 in law | 18th-century laws in Christianity | Amendments to the United States Constitution | First Amendment to the United States Constitution | Secularism in the United States | Separation of church and state

---

- This page was last modified on 27 August 2013 at 06:27.
- Text is available under the Creative Commons Attribution-ShareAlike License; additional terms may apply. By using this site, you agree to the Terms of Use and Privacy Policy.
  Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a non-profit organization.